USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __5_/13/10__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

JOHNATHAN BULLUCK,

Defendant.

**MEMORANDUM OPINION**
**& ORDER**

09 Cr. 652 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Jonathan Bulluck is charged in a one-count indictment with

possessing with intent to distribute 50 grams and more of crack cocaine. The crack

cocaine was recovered by New York City Police Department ("NYPD") officers during a

traffic stop of a livery cab in which Bulluck was riding as a passenger. Bulluck has

moved to suppress this evidence, arguing that both the traffic stop and the subsequent

search of the interior of the livery cab violated his Fourth Amendment rights.

For the reasons stated below, the motion to suppress is DENIED.

## I.     FACTUAL BACKGROUND

Shortly before midnight on November 8, 2008, two NYPD officers on

routine patrol in the vicinity of 196th Street and the Grand Concourse in the Bronx

conducted a traffic stop of a livery cab. The officers testified that they pulled over the

cab because the driver failed to signal before making a right turn from 196th Street onto

the Grand Concourse. While speaking with the driver, both officers observed Bulluck –

who was a passenger in the back seat of the cab – attempt to stuff a plastic bag under the

driver's seat. Bulluck was instructed to exit the vehicle. A police officer then recovered

the plastic bag from underneath the driver's seat.  Inside the bag were six packages

containing 596.4 grams of crack cocaine, $741 in cash, and two cell phones.  (Cmplt. ¶

3(d))  Bulluck was arrested and subsequently charged with possessing with intent to

distribute more than 50 grams of crack cocaine in violation of 21 U.S.C. §§ 812,

841(a)(1), and 841(b)(1)(A).

## II.      DEFENDANT'S MOTION TO SUPPRESS

### A.      Procedural History

Bulluck filed his motion to suppress on October 7, 2009.  The motion was

then briefed by both sides on the basis of what turned out to be a draft, unsigned

declaration from Bulluck.  The draft declaration from Bulluck contained the following

assertion:

> As we were driving, an unmarked car signaled for the driver to pull over.
> When this happened, the driver had not been speeding or driving
> erratically.  As far as I could tell he had not committed any traffic
> violations.  In addition, we were not doing anything criminal.  Nor were
> we engaged in conduct which would reasonably raise a suspicion that we
> were engaged in criminal activity.

(Oct. 26, 2009 Gov't. Br. 4 (quoting Def. Draft Decl. ¶ 5)); (Nov. 4, 2009 Def. Reply Br.

4 (quoting Def. Draft. Decl. ¶ 5)).

The executed declaration ultimately submitted by Bulluck omitted the

allegations concerning traffic violations.  This change was critical, given Bulluck's

challenge to the constitutionality of the traffic stop.  Accordingly, after this Court

discovered the discrepancy between the draft declaration that was the basis for the party's

briefing and the executed declaration that was ultimately filed with the Court, on

November 23, 2009, the Court directed the parties to submit amended briefs that relied

exclusively on the executed declaration. (Docket No. 17)  After the parties submitted

amended briefs, the Court conducted a suppression hearing on December 30, 2009, and

January 7, 2010.  After the hearing, the parties submitted post-hearing briefs.

> **B.**   **Bulluck's Declarations**

In support of his motion to suppress, Bulluck submitted two executed

declarations, dated October 7, 2009, and November 3, 2009.

Regarding the traffic stop, Bulluck's October 7 declaration states that

> an unmarked police car signaled for the driver to pull over.  When this
> happened, we were not doing anything criminal.  I did not know why we
> were being pulled over.

(Declaration of Jonathan Bulluck dated October 7, 2009 ("Oct. 7 Decl."), ¶ 5).

With respect to the crack cocaine, both of Bulluck's declarations state the

following:

> I was not aware of any drugs, or other illegal items being in the taxi-cab
> when I got into the vehicle.  I did not see any drugs or other illegal items
> anywhere in the car.  Nor was there any drug or drug paraphernalia visible
> anywhere in the backseat of the car.

(Oct. 7 Decl., ¶ 4; Declaration of Jonathan Bulluck dated November 3, 2009 ("Nov. 3

Decl."), ¶ 4).  In his November 3, 2009 declaration, Bulluck added that "[i]n the back

passenger area of the car was a plastic bag that belonged to me and that bag contained my

possessions."  (Nov. 3 Decl., ¶ 5)  Bulluck denied pushing the plastic bag underneath the

driver's seat or making any other "suspicious movements" when the police officers

approached the livery cab.  (Oct. 7 Decl., ¶ 9)

According to Bulluck, after the livery cab was stopped, one of the police

officers asked Bulluck to step out of the car and walked him to the rear of the car:

> After I stepped out of the car, the police escorted me away and put me at a
> distance from the driver and a distance from the car.  With my hands
> behind my back[,] the officer walked me to the back of the car in which I

had been a passenger.  I was not free to leave and was being physically held by one of the two officers.

The other police officer then searched the back passenger side of the car.

. . . . Neither the driver nor I consented to this search.

(Oct. 7 Decl., ¶¶ 10-12)

### C.     <u>Hearing Testimony</u>

The Court conducted a hearing concerning Bulluck's suppression motion on December 30, 2009 and January 7, 2010.  The NYPD officers who conducted the traffic stop and search – Dominic Robinson and Kenneth Patrick Doyle – testified at the suppression hearing.  Bulluck did not testify.

Doyle and Robinson are assigned to the anti-crime unit at the 52nd Precinct in the Bronx.  That unit focuses on robberies, grand larceny, and gun-related crimes, and while on patrol unit members make traffic stops.  (12/30/09 Tr. 7, 21)  On November 8, 2008, Doyle and Robinson were on patrol in the Bronx in an unmarked vehicle.  Officer Robinson was driving and Officer Doyle was seated in the front passenger seat.  Both officers were dressed in plainclothes. (12/30/09 Tr. 8, 22)

At about midnight, while travelling westbound on 196th Street, the officers observed a vehicle bearing Taxi and Limousine Commission license plates make a right turn from 196th Street onto the Grand Concourse.  (12/30/09 Tr. 9, 23)  Both officers testified that the driver failed to signal when making the right turn.  Accordingly, the officers initiated a traffic stop. (12/30/09 Tr. 9-10, 23)

The car – a livery cab – pulled over to the left side of the service road on the Grand Concourse.  Officer Robinson then approached the livery cab on the driver's side while Officer Doyle approached on the passenger side. (12/30/09 Tr. 10-11, 24)

Although Officer Robinson was in plainclothes, his shield was visible over his outermost garment.  (12/30/09 Tr. 11)

Officer Robinson testified that the driver appeared nervous but that when he asked if everything was alright, the driver replied "yes."  (12/30/09 Tr. 11)  While Robinson was speaking with the driver, he used a flashlight to illuminate the interior of the car.  Robinson observed Bulluck – who was seated in the back seat directly behind the driver – take "a plastic bag" from his lap, "drop[] it to the floor," and using "both of his hands" "attempt[] to put [the bag] underneath the driver's seat."  (12/30/09 Tr. 11)  Officer Robinson testified that the Defendant "hunched over [as] he tried to push [the plastic bag] underneath the seat."  (12/30/09 Tr. 11)

Officer Doyle – who was also utilizing a flashlight – testified that after the officers approached the livery cab he observed Bulluck "attempting to push a bag underneath the front driver's seat with his right foot."  (12/30/09 Tr. 24)  Bulluck was "moving his whole body more to try to get the bag further underneath the seat"; his hands were "at his side." (12/30/09 Tr. 24-25)

Officer Robinson testified that Bulluck's actions made him concerned for his safety, and Robinson instructed the driver to pop the locks on the car doors.  Robinson then opened the driver's side rear passenger door and instructed Bulluck to step out the vehicle.  (12/30/09 Tr. 12; 1/7/10 Tr. 54)  According to Officer Robinson, he had to repeat this direction three or four times – elevating his voice progressively – before Bulluck obeyed.  (1/7/10 Tr. 47; 12/30/09 Tr. 12-13)  After Officer Robinson instructed Bulluck to exit the vehicle, Officer Doyle came over from the passenger's side of the

vehicle to the driver's side.  (12/30/09 Tr.12; 1/7/10 Tr. 45)  Robinson instructed Bulluck to put his hands on top of the car and then frisked him for weapons. (12/30/09 Tr.12-13)

After Bulluck exited the back seat, the plastic bag in question was "visible on the floor."  (12/30/09 Tr. 12)  Officer Robinson testified that as he reached for the bag, he asked Bulluck "is this bag yours?" and Bulluck answered, "that's not mine, that bag's not mine."  (12/30/09 Tr. 12, 14; 1/7/10 Tr. 77)  Once Bulluck responded "that's not mine," Officer Robinson grabbed the bag.  When Officer Robinson grabbed the bag he felt something hard, which he thought might be "a gun or some other weapon."  (1/7/10 Tr. 73)  When Robinson opened the bag, he found another plastic bag, which in turn contained crack cocaine.  The crack cocaine was inside six large clear plastic bags. These bags were inside a black plastic bag which was, in turn, inside a blue plastic bag. The bag containing the crack cocaine was not knotted.  The bags containing the crack cocaine also contained two cell phones, one or both which was the hard object Robinson felt when he grabbed the bag.  (1/7/10 Tr. 65, 73)  Officer Robinson could not recall whether the cell phones and cocaine were all within the same plastic bag or whether the cell phones were inside the blue plastic bag that contained the black plastic bag and the crack cocaine.  (1/7/10 Tr. 75-76)  Once Robinson "saw the drugs inside the bag," he handcuffed Bulluck.  (12/30/09 Tr. 12, 14)

Officer Doyle gave a different account at the hearing.  He testified that after "Officer Robinson [took Bulluck] out of the vehicle," Doyle went to the driver's side of the vehicle to assist Officer Robinson.  Officer Robinson was attempting to place Bulluck's left hand on top of the car, and his right hand on top of the trunk, and "a little bit of a struggle" ensued.  Doyle grabbed Bulluck's right arm while Officer Robinson

grabbed his left arm and placed it behind his back.  Officer Robinson cuffed Bulluck,

who was then placed in the back of the officers' police vehicle.  Doyle remained by the

police vehicle while Officer Robinson returned to the livery cab and retrieved the plastic

bag.  Officer Robinson brought the plastic bag back to where Doyle was standing, opened

the bag, and showed Doyle the crack cocaine inside.  (12/30/09 Tr. 25-26)  Doyle did not

testify that Bulluck disclaimed ownership of the plastic bag; neither side questioned

Doyle on this point.

### D.     Post-Hearing Briefing

At the close of the hearing, defense counsel requested the opportunity to

file a post-hearing brief.  (1/7/10 Tr. 91).  The Court granted that application, and invited

the parties to brief several issues:

> Let me tell you what . . . issues I am interested in and how I see the legal
> analysis flowing.
>
> The first issue, of course, is whether the stop of the car itself was lawful.
> That's the beginning of the analysis. . . .
>
> Next issue, . . . Officer Robinson approaches the driver and asks in effect
> is everything okay.  Officer Robinson testified the driver appeared nervous
> to him and then he observed some movement from the passenger in the
> back seat.  He then directs the driver to unlock the doors of the car and he
> proceeds to tell the defendant to get out of the car and his testimony is that
> he had to repeat that direction three or four times before the defendant
> actually got out of the car.  So point two in the legal analysis, . . . was it
> lawful for Officer Robinson to give that instruction to the defendant to get
> out of the car.
>
> Then the officer testified that while the defendant has his hands on the
> roof of the car he reaches down and picks up a bag that he initially
> observed on the defendant's lap and then saw him attempt to tuck under
> the front seat of the car.  There is testimony to the effect that [he] felt
> something hard in the bag.  And then there's testimony that he asked the
> defendant whether the bag was his.  And that the defendant in substance
> said no.  That raises an issue of abandonment . . . and each side will make

7

their arguments as to whether Office Robinson's testimony on that point should be credited.

Assuming that a finding of abandonment is not made we then turn to the bag itself. Under <u>U.S. v. Paulino</u>, the facts were that after a police officer approached the vehicle he observed the passenger in the back seat put something under a rubber mat and the office retrieved what . . . turned out to be a wad of counterfeit money. The Second Circuit held that defendant as a passenger in the vehicle did not have a reasonable expectation of privacy in the area under the rubber mat and therefore the district court had erred in granting the motion to suppress.

So the question here is – there's a few questions – does the fact that the defendant was in a livery cab as opposed to a private car give him a greater expectation of privacy with respect to the passenger area of the vehicle? And Ms. Shroff has cited a decision from Judge Scheindlin which states or suggests in dicta that there is a greater expectation of privacy when you have hired a vehicle. So that's a legal issue.

There are also legal issues associated with the fact that the evidence was in a bag or perhaps in two bags. In <u>Paulino</u>, the wad of counterfeit money wasn't in any container at all. It was just a wad of cash that was found under the rubber mat. . . .there needs to be legal analysis about what is the significance of the fact that the drugs here were in one or more plastic bags? How does that bear on the inquiry . . . concerning a reasonable expectation of privacy?

So that's how I see the legal analysis flowing. Those are the issues I am interested in seeing addressed. You are welcome, of course to cite any other legal issues you think are important and give me law on those but as I've thought about the case that is how I see the legal analysis flowing.

(1/7/10 Tr. 91-94)

## **DISCUSSION**

Defendant's post-hearing briefing concerning his motion to suppress raises

three issues:

1. Did the police officers' initial stop of the livery cab violate Bulluck's Fourth Amendment rights?

2. Did Bulluck abandon the plastic bags and their contents, thereby waiving any possible Fourth Amendment claim? <u>See</u>, <u>e.g.</u>, <u>United States v.</u>

> Welbeck, 145 F.3d 493, 498 (2d Cir. 1998) ("A warrantless seizure of
> abandoned property does not offend the Fourth Amendment.").

3.      If Bulluck did not abandon the plastic bags and their contents, did he have a reasonable expectation of privacy in the passenger area of the livery cab?

Each of these issues is considered seriatim below.

## I.      THE TRAFFIC STOP

The stop of a cab, like the stop of a private vehicle, implicates the Fourth Amendment rights of the vehicle's driver and its passengers.  See Townes v. City of N.Y., 176 F.3d 138, 143 (2d Cir. 1999) (upholding district court's determination that "a taxicab stop implicates the Fourth Amendment rights of passengers"); United States v. Santiago, 950 F. Supp. 590, 594 (S.D.N.Y. 1996) ("The Government concedes that a stop of a taxicab is a 'seizure' within the meaning of the Fourth Amendment."); see also United States v. Hensley, 469 U.S. 221, 226 (1985) (stopping car and detaining its occupants constitutes seizure under the Fourth Amendment).  Accordingly, courts have recognized that automobile passengers have a cognizable Fourth Amendment interest entitling them to challenge the constitutionality of a traffic stop.  See Brendlin v. California, 551 U.S. 249, 251 (2007) ("When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment. . . . [A] passenger is seized as well and so may challenge the constitutionality of the stop."); Townes, 176 F.3d at 143; Santiago, 950 F. Supp. at 593 ("[T]he case law is clear that . . . a non-owner passenger of an automobile has standing to challenge the initial stop of the automobile in which he is riding.").

The Second Circuit has "held repeatedly that a traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment."

United States v. Stewart, 551 F.3d 187, 191 (2d Cir. 2009); see also Holeman v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005) ("The Fourth Amendment requires that an officer making such a stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." (citing Whren v. United States, 517 U.S. 806, 810 (1996)). Here, the question of whether the police officers had a reasonable suspicion or probable cause to believe that a traffic violation had been committed is easily resolved.

Both officers testified at the suppression hearing that the livery cab driver had committed a traffic violation by failing to signal before making a right turn from 196th Street onto the Grand Concourse.  (12/30/09 Tr. 9-10, 23)  Moreover, they issued the livery cab driver a summons for failure to signal.  (12/30/09 Tr. 16)

Bulluck has not offered any evidence that disputes this testimony.  In the draft declaration discussed above, Bulluck asserted that no traffic violation was committed.  (Def. Draft Decl., ¶ 5)  That assertion was withdrawn in the declaration ultimately filed, however.  (Oct. 7 Decl., ¶ 5)  While Bulluck states in his October 7 Declaration that he and the driver "were not doing anything criminal" when the police signaled the driver to pull over (Oct. 7 Decl., ¶ 5), this conclusory statement is not sufficient to cast doubt on the officers' consistent account.  See United States v. Ruiz, No. 94 Cr. 392 (LAP), 1994 U.S. Dist. LEXIS 15822, at *13 (S.D.N.Y. Nov. 7, 1994) (denying defendant's request for a suppression hearing where affidavit lacked specific facts and only stated that the police acted "for no apparent reason"); United States v. Viscioso, 711 F. Supp. 740, 745-46 (S.D.N.Y. 1989) (denying suppression hearing where

defendant disputed probable cause to arrest by stating in an affidavit that he "was not

doing anything illegal at the time of his arrest").

       Based on all the evidence, I conclude that the livery cab driver did in fact

fail to signal.  Because the traffic stop was based on this traffic violation, the stop

complied with the Fourth Amendment.  See Stewart, 551 F.3d at 193 ("[R]easonable

suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment

for law enforcement officers to make a traffic stop.").  Accordingly, the traffic stop

provides no basis for granting Bulluck's motion to suppress.[1]

---

[1]  As part of the traffic stop, the police were authorized to request that Bulluck exit the
vehicle, as the Supreme Court recently explained in Arizona v. Johnson:

> In [Pennsylvania v. Mimms, 434 U.S. 106 (1977) (per curiam)], the Court
> held that "once a motor vehicle has been lawfully detained for a traffic
> violation, the police officers may order the driver to get out of the vehicle
> without violating the Fourth Amendment's proscription of unreasonable
> searches and seizures."  434 U.S., at 111, n. 6.  The government's
> "legitimate and weighty" interest in officer safety, the Court said,
> outweighs the "de minimis"  additional intrusion of requiring a driver,
> already lawfully stopped, to exit the vehicle.  Id., at 110-111.  Citing Terry
> as controlling, the Court further held that a driver, once outside the
> stopped vehicle, may be patted down for weapons if the officer reasonably
> concludes that the driver "might be armed and presently dangerous."  434
> U.S., at 112.
>
> [Maryland v. Wilson, 519 U.S. 408 (1997)] held that the Mimms rule
> applied to passengers as well as to drivers.  Specifically, the Court
> instructed that "an officer making a traffic stop may order passengers to
> get out of the car pending completion of the stop."  519 U.S., at 415.
> "[T]he same weighty interest in officer safety," the Court observed, "is
> present regardless of whether the occupant of the stopped car is a driver or
> passenger." Id., at 413.

Arizona v. Johnson, 129 S. Ct. 781, 786-87 (2009) (citations omitted).

II.    <u>**ABANDONMENT**</u>

The next issue raised by Bulluck's motion to suppress is whether he told Officer Robinson that the plastic bag was not his and thereby abandoned the bag and its contents for purposes of the Fourth Amendment.

When an individual voluntarily abandons his property, he forfeits "any reasonable expectations of privacy that he might have had in the property." <u>United States v. Lee</u>, 916 F.2d 814, 818 (2d Cir. 1990). Accordingly, "there can be nothing unlawful in the Government's appropriation of such abandoned property." <u>Abel v. United States</u>, 362 U.S. 217, 241 (1960); <u>see also</u> <u>Welbeck</u>, 145 F.3d at 495, 498 (holding that defendant could not claim expectation of privacy in a bag placed underneath seat on train when he denied that the bag was his because "[a] warrantless seizure of abandoned property does not offend the Fourth Amendment"); <u>United States v. Springer</u>, 946 F.2d 1012, 1014, 1017 (2d Cir. 1991) (government agents did not violate Fourth Amendment when they seized defendant's suitcase after defendant denied that the suitcase was his and suggested that he had picked up the wrong suitcase). Accordingly, if Bulluck in fact disclaimed ownership of the plastic bag in question, then he cannot raise a Fourth Amendment challenge to the search and seizure of that bag.

The Government bears the burden of proof in establishing that Bulluck abandoned the property in question. <u>See</u> <u>United States v. Alexander</u>, 573 F.3d 465, 472 (7th Cir. 2009) ("To demonstrate abandonment, the government must prove by a preponderance of the evidence that the defendant's voluntary words or actions would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item to be searched." (citing <u>United States v.</u>

Pitts, 322 F.3d 449, 456 (7th Cir. 2003))); United States v. Sinkler, 91 Fed. App'x 226,

233 n.10 (3d Cir. 2004) (unpublished opinion) ("The Government, of course, will also

bear the burden of proving all relevant exceptions to the warrant requirement and any

other grounds for a permissible search that may apply here, including the abandonment of

the backpack. . . ."); United States v. James, 353 F.3d 606, 616 (8th Cir. 2003) ("At the

suppression hearing, the government bore the burden of establishing that Mr. James had

abandoned the discs."); United States v. Carter, No. 86 Cr. 700 (NG), 1987 U.S. Dist.

LEXIS 9636, at *8-9 (S.D.N.Y. Oct. 23, 1987) ("Since the search was admittedly

warrantless, the burden was on the Government to establish by a preponderance of the

evidence that Carter abandoned the property.").

        During the suppression hearing, Officer Robinson testified that he asked

Bulluck whether the bag belonged to him and that Bulluck responded, "that's not mine,

that bag's not mine."  (12/30/09 Tr. 14)  Officer Robinson testified that he questioned

Bulluck as he was in the act of reaching for the bag and that Bulluck responded "that's

not mine" before Officer Robinson had either grabbed or opened the bag.  (1/7/10 Tr. 35-

36)  Other evidence before the Court, however, casts significant doubt on Officer

Robinson's recollection.

        As an initial matter, evidence was introduced that between Bulluck's

arrest on November 8, 2008, and the suppression hearing in December 2009 – Officer

Robinson had never disclosed to anyone, and had never recorded in a report, memo book

entry or charging document, that Bulluck had disclaimed ownership of the bag.  Officer

Robinson testified that his recollection of Bulluck's statement "just came to me," on the

eve of the suppression hearing and fourteen months after the arrest.  (1/7/10 Tr. 27)  As

an officer with nine years of patrol experience and two years in the anti-crime unit (12/30/09 Tr. 7) – where traffic stops are routine (12/30/09 Tr. 7) – it seems likely that Officer Robinson would have understood both that the seizure of the crack cocaine presented a legal issue and that abandonment of this property by the defendant could be legally significant.

Robinson never mentioned Bulluck's denial of ownership in any of the written materials he prepared after the arrest.  (1/7/10 Tr. 4, 30)  When he met with a Bronx County Assistant District Attorney one day after the arrest to prepare a criminal complaint, he did not disclose the statement.  (1/7/10 Tr. 5)  Similarly, when he met with an ADA to prepare for his grand jury testimony, Officer Robinson did not mention Bulluck's purported statement. (1/7/10 Tr. 12-13)

After it was decided that Bulluck would be prosecuted in the federal system, Officer Robinson briefed Drug Enforcement Administration Special Agent Rodney Arrington on the case.  (1/7/10 Tr. 18)  Robinson testified that he did not recall whether he had informed Arrington of Bulluck's statement disclaiming ownership of the plastic bag. (1/7/10 Tr. 21)  Arrington's notes of his meeting with Robinson on April 28, 2009, however, make no reference to Bulluck disclaiming ownership of the bag.  (3501-A)

On December 21, 2009 – nine days before the scheduled suppression hearing – Officer Robinson met with an Assistant United States Attorney to prepare for his testimony.  (1/7/10 Tr. 24)  Clearly, by this time, Officer Robinson understood that an issue had arisen concerning the legality of the seizure of the crack cocaine.  Even then,

however, Officer Robinson did not disclose Bulluck's statement disclaiming ownership. (1/7/10 Tr. 26)

Officer Robinson met again with the AUSA and a federal investigator on December 28, 2009, to prepare for his upcoming testimony at the suppression hearing. (1/7/10 Tr. 28)  Once again, Officer Robinson did not disclose Bulluck's statement. (1/7/10 Tr. 29-30)  While driving home from that meeting or another meeting with the AUSA the following day, however, Officer Robinson called the AUSA on his cell phone and reported for the first time – fourteen months after the incident – Bulluck's statement disclaiming ownership of the bag.[2]  (1/7/10 Tr. 78)

In addition to the doubts raised by Robinson's long delay in disclosing Bulluck's statement to the prosecutors and other law enforcement personnel he met with – even after being told that Bulluck had raised a suppression issue – and his failure to record the statement in writing in any fashion, other evidence offered at the hearing undermines Officer Robinson's testimony on this point.

Officer Doyle's account of the encounter at the livery cab is inconsistent with Officer Robinson's account and consistent with Bulluck's description in his October 7 declaration.[3]  Doyle testified that after Bulluck exited the livery cab, Doyle walked over to the driver's side of the vehicle to assist Robinson, who was attempting to place

---

[2]  Given that the Government did not notify defense counsel of Officer Robinson's new recollection until the evening before the December 30, 2009 suppression hearing (12/30/09 Tr. 2), it appears that Officer Robinson did not recall the statement until the late afternoon or evening of the day before the hearing.

[3]  Doyle's account is consistent with Bulluck's October 7 Declaration in that Bulluck asserts that one of the officers escorted him away from the livery cab with his hands behind his back and that the other officer then searched the back passenger area of the livery cab.  (Oct. 7 Decl., ¶¶ 10-12)

Bulluck's left hand on top of the car and right hand on top of the trunk.  (12/30/09 Tr. 25)
A struggle ensued, and Doyle assisted Robinson in handcuffing Bulluck, who was then
placed in the officer's patrol car.  According to Officer Doyle, Officer Robinson then
returned to the livery cab, retrieved the plastic bag, returned to the police vehicle in
which Bulluck was seated, opened the bag, and showed Doyle the contents.  (12/30/09
Tr. 25-26)  Accordingly, Doyle's account of the sequence of events is entirely different
from Robinson's.  Moreover, Doyle's testimony included no reference to Robinson
questioning Bulluck about ownership of the bag, even though Doyle would have been
present at any such conversation.  Indeed, Doyle did not testify as to any conversation
between Robinson and Bulluck at the livery cab.[4]

       The reliability of Officer Robinson's testimony concerning Bulluck's
denial of ownership is further undermined by his repeated statements during the
suppression hearing that he could not recall details concerning the November 2008 arrest
because the arrest had taken place fourteen months ago.  For example, Officer Robinson
could not recall how many bags there were (1/7/10 Tr. 63-64), which plastic bag
contained the crack cocaine (1/7/10 Tr. 64, 68), which plastic bag contained the money
(1/7/10 Tr. 67), which plastic bag contained the cell phones (1/7/10 Tr. 69), or whether
the cocaine and the cell phones were in the same plastic bag or different plastic bags.[5]
(1/7/10 Tr. 75, 76)  With respect to certain of these facts, Officer Robinson's recollection
was refreshed with grand jury testimony and other documents.  (1/7/10 Tr. 64, 67)  As to

---

[4]  As noted above, neither side asked Doyle whether Robinson had questioned Bulluck
about ownership of the plastic bag.

[5]  Officer Robinson likewise could not recall whether he had met with the AUSA on
December 23, 2009, a meeting that would have taken place only two weeks before.
(1/7/10 Tr. 27)

Bulluck's statement demonstrating abandonment, however, there is no prior testimony or documentation supporting Officer Robinson's recollection.

Under these circumstances, I cannot credit Officer Robinson's sudden recollection of Bulluck's statement disclaiming ownership.  The Government has not met its burden of establishing by a preponderance of the evidence that Bulluck abandoned the plastic bag and its contents.  See James, 353 F.3d at 616; Carter, 1987 U.S. Dist. LEXIS 9636, at *8-9.

III.     THE SEARCH OF THE REAR INTERIOR OF THE LIVERY CAB

The third issue raised by Bulluck's post-hearing submissions is whether Officer Robinson's search of the interior of the livery cab violated the Fourth Amendment.  Bulluck contends that he had a reasonable expectation of privacy in the livery cab's passenger area because "by paying his fare and gaining exclusive control of the rear interior of the cab, Mr. Bulluck had both an objectively and subjectively reasonable expectation of privacy in the rear interior. . .and the accompanying Fourth Amendment right to seek suppression of the drugs at issue."  (Def. Post-Hearing Br. 10-11)  The Government argues, however, that Bulluck had no reasonable expectation of privacy in the livery cab's passenger area and therefore lacks standing to assert a Fourth Amendment violation regarding the search of that area.  (Gov't. Post-Hearing Br. 15)

A.      Non-Owner Passenger's Reasonable Expectation of Privacy

"When considering a claimed violation of Fourth Amendment rights, the burden is on the Defendant to establish that his own rights under the Fourth Amendment were violated."  United States v. Paulino, 850 F.2d 93, 96 (2d Cir. 1988).  If Bulluck cannot carry this burden, he cannot raise a Fourth Amendment challenge to the search of

the passenger area of the livery cab.  In order to determine whether Bulluck has met this burden, this Court must decide whether he possessed a "reasonable expectation of privacy"[6] in the area of the cab that was searched.  See United States v. Perea, 986 F.2d 633, 639 (2d Cir.1993) ("In support of a motion to suppress evidence found in a warrantless search, the defendant must show that he had a reasonable expectation of privacy in the place or object searched." (citing California v. Greenwood, 486 U.S. 35, 39 (1988)).

Determining whether Bulluck possessed a reasonable expectation of privacy in the rear interior area of the livery cab requires a two-step inquiry:

> A defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a "legitimate expectation of privacy" in the place searched.  Rakas v. Illinois, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).  This inquiry involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable.  See Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); accord United States v. Chuang, 897 F.2d 646, 649 (2d Cir. 1990).

United States v. Hamilton, 538 F.3d 162, 167 (2d Cir. 2008); see also Smith v. Maryland, 442 U.S. 735, 740 (1979) (describing two-step inquiry as first, "'whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy'" and second "whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable'— [that is] whether . . . the individual's expectation,

---

[6]  Courts use the terms "reasonable expectation of privacy" and "legitimate expectation of privacy" interchangeably.  See, e.g., United States v. Navas, 597 F.3d 492, 498 (2d Cir. 2010) ("Thus, citizens' reasonable expectations of privacy in their vehicles are reduced by the far-reaching web of state and federal regulations that covers not only vehicles but also our nation's roadways."); but see United States v. Watson, 404 F.3d 163, 166 (2d Cir. 2005) ("The defendant 'bears the burden of proving . . . that he had a legitimate expectation of privacy.'" (quoting Rawlings v. Kentucky, 448 U.S. 98, 104-05 (1980)).

viewed objectively, is 'justifiable' under the circumstances." (quoting Katz v. United States, 389 U.S. 347, 351, 353, 361 (1967)); Perea, 986 F.2d at 639 ("[A] defendant may establish that he had a right protected by the Fourth Amendment by showing (a) that he had an expectation of privacy that society is prepared to recognize as reasonable, and (b) that he had conducted himself and dealt with the property in a way that indicated a subjective expectation of privacy.").

As to the subjective prong of this analysis – whether Bulluck by his conduct exhibited a subjective expectation of privacy – this Court finds that he did manifest such a subjective expectation.  According to both Officer Robinson and Officer Doyle, when the police approached the livery cab, Bulluck sought to stuff the plastic bag under the front driver's seat, presumably to hide the bag.[7]  Under such circumstances, the Second Circuit and other courts have found that defendants have demonstrated a subjective expectation of privacy.

In United States v. Paulino, 850 F.2d 93 (2d Cir. 1988), when the police approached a double-parked car and questioned the driver, the defendant – seated, like Bulluck, in the rear passenger seat behind the driver – was observed "bending over as if placing an object on the floor."  850 F.2d at 94.  The police officer instructed all occupants of the car to exit and searched the rear floor of the vehicle.  Underneath an opaque rubber mat, the police officer discovered a wad of currency.  Upon examining the serial numbers of the bills, the officer realized that the currency was counterfeit and arrested the defendant.  Id.  The Second Circuit ruled that by hiding the counterfeit bills

---

[7]  While Bulluck denies in his declaration that he attempted to hide the plastic bag when the officers approached (Oct. 7 Decl., ¶ 9), this Court credits the officers' testimony on this point.

under the rubber mat, and putting his feet on the mat, Paulino had "clearly evidenc[ed] his desire to keep these items private." Id. at 97.  Many other courts have held that evidence that a defendant has hidden an object in a particular area evinces a subjective expectation of privacy in that area.  See, e.g., United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009) ("We are satisfied that Rheualt's decision to place the gun and drugs inside the washing machine on the third-floor landing sufficiently evidences an intent to hide them, and thus demonstrates a subjective expectation of privacy."); United States v. Williams, No. 05 Cr. 191 (CFD), 2007 U.S. Dist. LEXIS 89570, at *11-12 n.6 (D. Conn. Dec. 6, 2007) ("Courts have found that a defendant exhibits a subjective expectation of privacy in the area in which he or she hides contraband." (citing United States v. King, 227 F.3d 732, 743 (6th Cir. 2000) (defendant exhibited an actual subjective expectation of privacy in the basement by hiding the cocaine there); United States v. Bailey, 628 F.2d 938, 943-44 (6th Cir.1980) (defendants exhibited an expectation of privacy in a locked storage compartment in an apartment's basement by hiding a drum of chemicals there)). Accordingly, by attempting to hide the plastic bag containing the crack cocaine under the front seat of the cab, Bulluck has adequately demonstrated a subjective expectation of privacy in the area in and around the floor underneath the driver's seat.

Bulluck must also establish, however, that his subjective expectation of privacy in that area was objectively reasonable.  It is well settled that non-owner passengers cannot bring a Fourth Amendment challenge to a search of the interior of a vehicle because they do not possess a reasonable expectation of privacy in a vehicle that is not their own.  See Rakas, 439 U.S. at 148 (non-owner passengers in a private automobile do not have reasonable expectation of privacy and thus could not contest a

search of the glove compartment and the area beneath the seats); Paulino, 850 F.2d at 97

(holding that a non-owner passenger could not contest on Fourth Amendment grounds a

search underneath the floor mat of a private vehicle because he "lacked a reasonable

expectation of privacy in that portion of the automobile searched"); see also United States

v. Leon, No. 94 Cr. 308 (PKL), 1994 U.S. Dist. LEXIS 14318, at *9 (S.D.N.Y. Oct. 6,

1994) ("Generally, passengers are considered to have a lower expectation of privacy in

the vehicle in which they are traveling, because, inter alia, they have no right to exclude

others from the vehicle . . . and since the owner clearly has a greater expectation of

privacy." (citing Paulino, 850 F.2d at 97)). Rakas and Paulino do not state that their

holdings are limited to private automobiles, nor does either decision suggest a distinction

between commercial and non-commercial traffic.

   In Rakas, the passengers in a car moved to suppress a box of rifle shells

found in the car's glove compartment and a sawed-off rifle discovered under the front

passenger seat.  In considering whether the defendants had demonstrated a reasonable

expectation of privacy in the areas searched, the Supreme Court noted that mere presence

in a vehicle with the owner's permission "is not determinative of whether . . . [a

passenger] has a legitimate expectation of privacy in the particular area of the automobile

searched." Rakas, 439 U.S. at 130.  In considering whether the passengers in Rakas had

a reasonable expectation of privacy in the areas of the car that were searched, the Court

noted the relevance of property rights to the inquiry, and specifically whether the

defendants had the right to exclude others from the areas searched:

> Legitimation of expectations of privacy by law must have a source outside
> of the Fourth Amendment, either by reference to concepts of real or
> personal property law or to understandings that are recognized and
> permitted by society.  One of the main rights attaching to property is the

> right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1,
> and one who owns or lawfully possesses or controls property will in all
> likelihood have a legitimate expectation of privacy by virtue of this right
> to exclude.  Expectations of privacy protected by the Fourth Amendment,
> of course, need not be based on a common-law interest in real or personal
> property, or on the invasion of such an interest.  These ideas were rejected
> both in Jones, supra, and Katz, supra.  But by focusing on legitimate
> expectations of privacy in Fourth Amendment jurisprudence, the Court has
> not altogether abandoned use of property concepts in determining the
> presence or absence of the privacy interests protected by that Amendment.

Id. at 143 n.12 (emphasis added).

In holding that the suppression motion in Rakas was properly denied, the

Supreme Court concluded that the non-owner passengers had

> made no showing that they had any legitimate expectation of privacy in
> the glove compartment or area under the seat of the car in which they were
> merely passengers.  Like the trunk of an automobile, these are areas in
> which a passenger qua passenger simply would not normally have a
> legitimate expectation of privacy.

Id. at  148-49.

In examining the privacy expectations of a non-owner passenger in a

private vehicle in Paulino, the Second Circuit focused on the fact that such passengers do

not have the "right to exclude others from the vehicle."  Paulino, 850 F.2d at 97.  In

Paulino, as noted above, the police approached a double-parked vehicle and then

observed a passenger in the rear seat place an object on the floor.  Id. at 97.  The police

ordered all three occupants out of the car and found a packet of counterfeit U.S. currency

under the rubber floor mat in front of the back seat.  Id.  The Second Circuit held that the

defendant, as a mere passenger in the automobile, did not have a reasonable expectation

of privacy in the area beneath the floor mat.  Id. at 97 ("[W]e are unprepared to hold that

[the passenger's] expectation of privacy is one that society willingly accepts as reasonable.").[8]

With respect to vehicles for hire, in United States v. Perea, 986 F.2d 633, 639 (2d Cir. 1992), the Second Circuit held that taxicab passengers lack a reasonable expectation of privacy in a taxicab's trunk. In reaching this conclusion, the court – quoting the "right to exclude others" language from Rakas, 439 U.S. at 143 n.12 – focused on whether a taxicab passenger has a right to exclude others from the cab's trunk:

> The contention that Perea had a reasonable expectation of privacy in the cab's trunk does not require extended discussion. . . .He did not have the right to exclude others from the trunk; the driver had a greater right than he to look into the trunk, to place objects in it, or to remove other objects from it. . . .Hence, we agree with the district court's ruling that Perea could have no reasonable expectation of privacy in the trunk.

986 F.2d at 639.

The consistent teaching of Rakas and Paulino is that non-owner passengers ordinarily do not have a reasonable expectation of privacy in the interior of

---

[8]  Bullock contends that Paulino is inapposite because it pre-dates the Supreme Court's decision in Arizona v. Gant, 129 S. Ct. 1710 (2009). (Def. Post-Hearing Br. 14 n.4). Gant addresses the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement. In New York v. Belton, the Court had held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." 453 U.S. 454, 460 (1981). The Supreme Court clarified in Gant that Belton permits "an officer to conduct a vehicle search when an arrestee is within reaching distance of the vehicle or it is reasonable to believe the vehicle contains evidence of the offense of arrest," Gant, 129 S. Ct. at 1721, and rejected a broader reading of Belton that was advanced by Arizona. Gant does not, however, change the law concerning a passenger's reasonable expectation of privacy in an automobile; the decision does not address that issue. Accordingly, the holdings in Rakas and Paulino were not affected by Gant. Cf. United States v. Almaraz, No. 09 Cr. 159 (SAS), 2009 U.S. Dist. LEXIS 54138, at *6 (S.D.N.Y. June 26, 2009) (holding that "Gant does not alter the broader automobile exception to the warrant requirement").

the vehicles in which they are traveling, because they do not control access to the vehicle and do not have the right to exclude others.  These courts demanded that a defendant seeking to suppress evidence seized from a vehicle demonstrate a property or possessory interest in the car, or to identify some other "understanding[] that [is] recognized and permitted by society" justifying an expectation of privacy.  Rakas, 439 U.S. at 143 n.12; Paulino, 850 F.2d at 97; see also United States v. Pulliam, 405 F.3d 782, 786 (9th Cir. 2005) ("As a passenger with no possessory interest in the car . . ., [defendant] has no reasonable expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the car." (quotation omitted)).  Perea uses the same logic in refusing to find that a taxicab passenger has a reasonable expectation of privacy in a cab's trunk:  even though the passenger in that case had hired the car for transport, the driver, and not the passenger, controlled access to the trunk.  Accordingly, the passenger had no reasonable expectation of privacy in that area of the car.  Perea, 986 F.2d at 639.

While these Supreme Court and Second Circuit cases provide a useful backdrop for consideration of Bulluck's claim, they do not address the precise issue here: i.e., whether a taxi or livery cab passenger has a reasonable expectation of privacy in the rear passenger portion of a cab in which he or she is travelling.  While Bulluck cites United States v. Rios, 364 U.S. 253 (1960), in support of his argument that a taxicab passenger has a reasonable expectation of privacy in the rear passenger area of the cab for the duration of his or her ride (Def. Post-Hearing Br. 13), the Rios court did not address this issue.  Rios discusses abandonment ("[a] passenger who lets a package drop to the floor of the taxicab in which he is riding can hardly be said to have '"abandoned"'it,"

Rios, 364 U.S. at 262 n.6), but does not address a taxi passenger's reasonable expectation of privacy in the cab's rear passenger area, as the Supreme Court recognized in Rakas:

> The dissent states that Katz v. United States expressly recognized protection for passengers of taxicabs and asks why that protection should not also extend to these petitioners.  Katz relied on Rios v. United States, 364 U.S. 253 (1960), as support for that proposition.  The question of Rios' right to contest the search was not presented to or addressed by the Court. . . .

Rakas, 439 U.S. at 149 n.16.

Moreover, in Townes v. City of New York, 176 F.3d 138 (2d Cir. 1999), a Section 1983 action, the Second Circuit noted that "it is an open question whether [a taxicab passenger] ha[s] a clearly established expectation of privacy in the passenger area of the taxicab in which he [i]s riding."[9]  Townes, 176 F.3d at 145 n.2.  Accordingly, lower court decisions and decisions outside of this Circuit must be consulted in resolving this issue.

**B.**     **Taxicab Passenger's Reasonable Expectation of Privacy**

      **1.**     **Legal Authority**

Lower courts in this Circuit have disagreed as to whether taxicab passengers have a reasonable expectation of privacy in the interior of a cab in which they are travelling.  In United States v. Buckner, 417 F. Supp. 2d 240, 241-42 (S.D.N.Y. 2005), the defendant moved to suppress a revolver found beneath the front passenger seat of a livery cab in which he was arrested.  The cab was stopped after the police observed someone throw trash out of the cab's window.  When the officers approached the cab,

---

[9]  Bulluck's reliance on United States v. Gaines, 457 F.3d 238 (2d Cir. 2006) (Def. Post-Hearing Br. 13) is likewise misplaced.  In Gaines, the Court addressed solely the legality of a traffic stop.  The Gaines court never reached the issue of whether the defendant passenger had a reasonable expectation of privacy in the back seat area of the cab. Gaines, 457 F.3d at 243-44.

they observed the defendant – sitting in the rear passenger seat – kick something under the front passenger seat. After removing the defendant from the cab, the police searched the vehicle and found a revolver. Buckner, 417 F. Supp.2d at 241. The court denied the defendant's motion to suppress: "Like the Paulino passenger, the Defendant had no right to exclude others from the livery cab because he was a mere passenger. . . . The Court finds that Defendant has not presented sufficient facts to show that he had a legitimate expectation of privacy in the area underneath the front passenger seat. . . ." Id. at 242.

Similarly, in United States v. Culmer, No. 89 Cr. 0448 (SWK), 1989 U.S. Dist. LEXIS 13013, at *13 n.2 (S.D.N.Y. Oct. 30, 1989), the court considered the stop and subsequent search of a hired car. The Government contended that police officers conducted a Terry stop of the vehicle for the purpose of, inter alia, questioning a passenger about a fugitive. After the vehicle was stopped, the police observed a passenger in the rear seat attempt to hide something under the front seat. The officers directed the occupants of the car to get out of the car and discovered a paper bag under the front seat. The bag was opened and found to contain 300 grams of crack cocaine and 125 grams of cocaine. 1989 U.S. Dist. LEXIS 13013, at *2-5. The defendants moved to suppress the drug evidence. While the court found that "the defendant here did manifest a subjective expectation of privacy in the bag by trying to shove it under the seat, such expectation is not one that society accepts as reasonable." The court ruled that the defendants had not established a reasonable expectation of privacy under these circumstances, and specifically rejected defendants' argument that Paulino was inapplicable in the context of a hired car case, noting that there was no basis to

26

"distinguish cases involving hired cars from those involving private cars."[10]  Id. at * 13 & n.2.

     In United States v. Santiago, 950 F. Supp. 590 (S.D.N.Y. 1996), however, a court stated in dicta that a passenger in a livery cab possesses a reasonable expectation of privacy in the passenger area of the cab.  In Santiago, the police officers pulled over a livery cab as part of a program known as the Mobile Taxi/Livery Robbery Task Force. The purpose of the program was to conduct routine safety checks of occupied livery cabs. Officers spoke with drivers, gave them safety pamphlets, and typically looked in the back seat to "make sure [that] everything is okay."  Santiago, 950 F. Supp. at 591-93.  As the police approached the livery cab in which Santiago was travelling, they observed him

---

[10]  Other courts have rejected arguments that a taxicab passenger has a reasonable expectation of privacy in the interior of a cab.  United States v. Scott, No. 05 Cr. 113-2, 2006 U.S. Dist. LEXIS 81719, at *34 n.12 (E.D. Pa. Oct. 13, 2006) ("The Court notes additionally that Defendant lacks standing to challenge the seizure of items found in the backseat of the taxi because he does not have reasonable expectation of privacy for that area." (citing Rakas 439 U.S. at 133-134)); Lanza v. State, 579 So. 2d 8, 10 (Ala. Crim. App. 1990) ("The appellant argues that the search of the taxi cab, in which he was a passenger, was unconstitutional.  In the present case, two packets of cocaine were found underneath the back seat of the taxi cab.  The appellant does not claim any possessory interest in the vehicle nor does he assert that he had any expectation of privacy. . . . The appellant in the present case does not have standing to object to the search of the taxi cab."); Judge, 455 N.Y.S.2d at 928-29 ("The defendants state that a legitimate expectation of privacy has been created in the rear of the cab by virtue of the fact that the defendants hired the cab for transportation.  The defendants argue that this hiring of the cab creates a 'leasehold interest' in the vehicle, that they had a 'possessory interest' in the back seat of the cab by virtue of their exclusive use of the cab during the course of their ride; they believe a legitimate expectation of privacy has been established . . . . While it is true the leasing of a vehicle is a form of a possessory interest which can create a legitimate expectation of privacy, a contractual arrangement to use a cab is not a lease . . . . This court does not find any precedent, nor have the defendants shown any 'legitimate expectation of privacy' in the rear seat portion of the cab.  A cab rider has a right, along a public conveyance, to contractually exclude other riders; however this does not amount to a lease in the car and does not elevate his status sufficiently above mere passengers to create a 'legitimate expectation of privacy' in the area under the seat of the car.").

looking back, reach down, and put something on the floor.  Id.  Santiago was instructed to exit the cab and the officers retrieved a gun from underneath the front passenger seat.  Id.

The court determined that the initial stop of the livery cab was not based on probable cause or reasonable suspicion and ordered suppressed all evidence that had been seized as "fruit of the poisonous tree."  Id. at 593-94.  The court went on to address in dicta, however, the constitutionality of the search and a livery cab passenger's reasonable expectation of privacy.  Santiago, 950 F. Supp at 597.

The court in Santiago first acknowledged that "[t]ypically, a passenger in an automobile does not have a right to expect privacy as he has no right to exclude others from the car."  Id. (citations omitted).  The court viewed taxicab passengers as enjoying greater rights, however, because their hiring of the vehicle gives them a possessory interest in the passenger area for the duration of their trip:

> [A] passenger in a taxicab may exclude others from the cab, as he has hired the cab for his exclusive use for the duration of his trip.  In effect, the passenger area belongs to the passenger who pays for it during the course of the trip.  The passenger determines the destination of the taxicab. There is no question that the rear seat of a taxicab belongs exclusively to the passenger for the duration of the ride for which he hired the cab.  Thus, defendant has established a Fourth Amendment interest in the search and seizure at issue in this stop.

Id. at 598 (citations omitted).

In concluding that taxi passengers enjoy a reasonable expectation of privacy in the back seat area of a taxicab, Santiago relied on one federal decision from the District of Columbia district court, United States v. Harris, Crim. No. 89-0290 (RCL), 1989 U.S. Dist. Lexis 11972 (D.D.C. Oct. 12, 1989), and four state court decisions from New York, Texas, and Maryland.

Harris is confusing both procedurally and substantively.  In that case, the defendants moved to suppress cocaine recovered from a non-defendant passenger's purse after the taxicab the three passengers were riding in was stopped by the police.  Id. at *3.  Although the Government conceded that the stop of the vehicle had not been based on reasonable suspicion or probable cause – a concession that mandated suppression of the evidence, see, e.g., United States v. Scopo, 19 F.3d 777, 781 (2d Cir. 1994) ("Any evidence seized based upon an illegal stop is subject to the fruit of the poisonous tree doctrine, and may be suppressed." (citing Wong Sun v. United States, 371 U.S. 471 (1963) (internal quotations omitted)) – the court went on to consider whether the defendants had a reasonable expectation of privacy in the area of the taxicab in which the purse was found, and in the purse itself.  The court initially stated that "defendants had a protected privacy interest in some portion of the taxi's interior," mistakenly citing, inter alia, Rios.  Id. at *8.[11]  The court then stated, however, that "on the existing record [it] could not make any finding as to the extent of the defendant's privacy interest within the taxi."  Id. at *9 n. 5.  Later in the opinion, the court ruled:

> [i]n light of the defendants' failure to introduce any evidence at the hearing which would support their claim that the search of the area containing Ms. Good's purse interfered with their constitutionally protected privacy interests, this court finds that the search of the area of the taxi in which Ms. Good's purse was located did not violate the fourth amendment rights of [the defendants].

Id. at *9-10.  The court went on to deny the motion to suppress.  While the Harris court – in this opinion – appeared to acknowledge that a passenger in a taxicab could theoretically have a privacy interest in the taxi's interior, the court did not find such a

---

[11]  The court accepted the argument, discussed in detail below and rejected, that a taxicab passenger's expectations of privacy are comparable to those of a hotel guest.  Harris, 1989 U.S. Dist. Lexis 11972, at * 8 n.6.

privacy interest in that case.  In any event, this opinion – which is the decision cited in

Santiago – was vacated six days later.  United States v. Harris, Crim. No. 89-0290 (RCL),

1989 U.S. Dist. Lexis 12331 (D.D.C. Oct. 18, 1989).

        Nothing in Harris II supports an argument that taxicab passengers have a

reasonable expectation of privacy in a cab's interior.  Indeed, in rejecting that argument,

the court noted that the defendants had done no more than assert that they were travelling

together in the cab and that the government had charged them with possession of the

drugs; the court ruled that such "assertions are insufficient to support a finding that they

had a legitimate expectation of privacy in . . . the portion of the taxi's interior in which

the bag was located."  Id. at *6 n.3.  The court went on to grant the motion to suppress,

however, because the Government's initial stop of the cab violated the Fourth

Amendment.  Id. at *11-12.

        No federal court has relied on Santiago for the proposition that a taxi

passenger possesses a reasonable expectation of privacy in the passenger area of a cab,

and this Court's research has uncovered no federal case containing such a holding.[12]

Only Santiago has cited Harris as standing for that proposition.

        The state court decisions cited in Santiago add little to this discussion.

People v. Millan, 69 N.Y.2d 514 (1987) – did not reach the question of whether a taxicab

passenger has an expectation of privacy in the passenger compartment.  See 69 N.Y.2d at

---

[12]  The Eleventh Circuit mistakenly assumed that taxi passengers have a reasonable
expectation of privacy, but did so based upon Rios and Katz, which – as explained above
– do not stand for that proposition.  See United States v. Harris, 526 F.3d 1334, 1338
(11th Cir. 2008) ("Supreme Court cases indicate that a taxicab passenger enjoys a
legitimate expectation of privacy in a cab, although the Court has not defined the exact
parameters of such expectation." (citing Katz, 389 U.S. at 352; Rios, 364 U.S. at 261-
62)).

520 n.5 ("Because our decision that defendant had a right to challenge the search of the cab depends upon the fact that he was charged with constructive possession of a weapon . . . and because our holding that he has a right to contest the search of the cab is limited to that situation, it is unnecessary to reach the issue . . . whether, under other circumstances, defendant as a passenger in a cab would have had a right of privacy in the passenger compartment. . . . We do not decide that issue.").[13]

        People v. Castro, 125 Misc. 2d 15, 23-24 (Sup. Ct. N.Y. Cty. 1984) holds that taxicab passengers have a reasonable expectation of privacy in "at least . . . the area in the back seat where they [are] seated," but reaches this conclusion based on the court's

---

[13]  While the New York Court of Appeals chose not to address a taxicab passenger's expectation of privacy, the Appellate Division, First Department opinion in Millan squarely held that a taxi passenger has no reasonable expectation of privacy in the passenger area of a cab:

> [Defendant] rests his claim solely on his status as a passenger in a livery taxicab, thus distinguishing his situation from that of the petitioners in Rakas. . .who were passengers in a private car.  Having hired the vehicle, defendant asserts, he had the right to exclude other passengers from occupying it. . . . Inherent in the exclusive right to occupancy, he argues, is a legitimate expectation of privacy in the taxicab.  It is, of course, axiomatic that the right to exclude, an incident of both ownership and the lawful possession of property, normally imputes to such owner or possessor a legitimate expectation of privacy. . . .

> Measured against the[] principles [set forth in Rakas], defendant's claim of a legitimate expectation of privacy in the rear compartment of the taxicab must fail.  A passenger in a taxicab cannot rationally expect privacy in an area which, by necessity, he must share with a stranger, the driver. . . . Indeed, not only is a taxicab driver not under any obligation to keep the activities of his passengers confidential, but in certain circumstances he has an affirmative duty to report these activities to the police.

People v. Millan, 118 A.D.2d 236, 242 (1st Dep't 1986).

mistaken belief that the U.S. Supreme Court in <u>Rios</u> ruled that taxicab passengers have a reasonable expectation of privacy in this area.  <u>Castro</u>, 125 Misc.2d at 23.

In <u>Chapa v. State</u>, 729 S.W.2d 723 (Tex. Cr. App. 1987), the Texas Court of Criminal Appeals held that a taxicab passenger had a reasonable expectation of privacy in that part of the taxi the passenger occupied because "he could determine [the cab's] destination" and because – under a local regulation – the passenger had the "'<u>exclusive</u> right to the passenger compartment.'"  <u>Chapa</u>, 729 S.W. 2d at 728 (quoting Houston, Tex., Code § 46-29 (1985)) (emphasis in original).  The Maryland Court of Appeals reached the same result in <u>Bates v. State</u>, 64 Md. App. 279, 285, 494 A.2d 976, 979 (Md. 1985), noting that a taxicab passenger determines the destination, may choose the route, and – under a Maryland regulation – may not be compelled by the driver to share a ride.

2.     <u>**Discussion**</u>

a.     <u>**The Hotel Room Analogy**</u>

Here, building on <u>Santiago</u> and <u>Harris</u>, Bulluck argues that a passenger in a taxicab is more like a hotel guest – who possesses a reasonable expectation of privacy in his or her hotel room – than a non-owner passenger riding in a private automobile:

> [T]here is a fundamental difference between private cars, where passengers could have no privacy interest, and cases involving taxis, livery cabs, and other cars-for-hire, where passengers pay for the right to such privacy.  Just as a person who rents a hotel room acquires a reasonable expectation of privacy in his hotel room for the duration of his stay, Mr. Bulluck, by paying for the exclusive use of the back seat of the cab, acquires a reasonable expectation of privacy in that partitioned area of the cab for the duration of his ride.

(Def. Post-Hearing Br. 11-12 (footnote and citations omitted))  In this Court's view, the reasonable expectations of privacy held by a hotel guest and a taxicab passenger are fundamentally different, and the analogy made by Bulluck is not sound.

As an initial matter, Fourth Amendment jurisprudence has long recognized that those traveling in an automobile have a lesser expectation of privacy than those ensconced in a home or other dwelling place.  See Gant, 129 S. Ct. at 1720 ("[W]e have recognized that a motorist's privacy interest in his vehicle is less substantial than in his home. . . ."); Rakas, 439 U.S. at 148 ("We have on numerous occasions pointed out that cars are not to be treated identically with houses or apartments for Fourth Amendment purposes." (citations omitted)).  This logic forms the basis of the automobile exception itself.  Wyoming v. Houghton, 526 U.S. 295 (1999) ("Passengers, no less than drivers, possess a reduced expectation of privacy with regard to the property they transport in cars."); Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) ("More recent cases provide a further justification [for the automobile exception]:  the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation."); Paulino, 850 F.2d at 95 ("[A] second-rationale developed to distinguish motor vehicles from homes based on the lesser expectation of privacy in an automobile. . . .").

Moreover, a hotel guest possesses a far less fleeting and much more significant privacy interest in a hotel room than a taxi passenger possesses in a taxicab. A hotel guest generally occupies a hotel room for a much longer period of time than a taxi passenger occupies a cab, usually staying overnight.  The Supreme Court has recognized that duration of occupation matters.  While an overnight guest in someone else's home has a cognizable Fourth Amendment interest, a guest who is only present for

a matter of hours does not necessarily have a reasonable expectation of privacy.  <u>See</u>

<u>Minnesota v. Olson</u>, 495 U.S. 91 (1990) (holding that an overnight guest in a house had

the sort of expectation of privacy that the Fourth Amendment protects); <u>but</u> <u>see</u>

<u>Minnesota v. Carter</u>, 525 U.S. 83, 90 (1998) (holding that guests lacked reasonable

expectation of privacy in another's home because, <u>inter</u> <u>alia</u>, guests were present for

commercial transaction and "were only in the home for a matter of hours").  Accordingly,

a taxi passenger's transitory presence in a taxicab is of a fundamentally different nature

than a hotel guest's stay in a hotel room, and this factor is relevant to the reasonable

expectation of privacy inquiry.

   In addition, while the taxi passenger uses the cab as a means of

transportation, the hotel guest uses the hotel room as a form of shelter and as a repository

for his or her belongings, and because he or she wants privacy.  As the Supreme Court

explained in <u>Minnesota v. Olson</u>, in discussing the privacy interest of an overnight guest:

> From the overnight guest's perspective, he seeks shelter in another's home
> precisely because it provides him with privacy, a place where he and his
> possessions will not be disturbed by anyone but his host and those his host
> allows inside.  We are at our most vulnerable when we are asleep because
> we cannot monitor our own safety or the security of our belongings.  It is
> for this reason that, although we may spend all day in public places, when
> we cannot sleep in our own home we seek out another private place to
> sleep, whether it be a hotel room, or the home of a friend.

<u>Olson</u>, 495 U.S. at 98-99.  The hotel guest has a far more significant privacy interest in a

hotel room than a taxi passenger has in a taxicab because the hotel guest has sought out

the hotel room specifically because it is a private place where he or she can maintain

personal security and the security of belongings not for a fleeting period but generally for – at a minimum – many hours.[14]

The hotel guest also exercises far more control over his or her hotel room than a taxi passenger has in the passenger area of a cab.  Unlike the taxi passenger, the hotel guest is given a key to the room, has the ability to lock the room from the inside, and controls who is permitted entry.  In a cab, the driver never surrenders effective control of the vehicle, or any portion of the vehicle, to the passenger.  Only the driver has a key to the cab's doors, and the driver controls the locks.

Finally, it is useful to consider courts' treatment of third-party consents-to-search in the hotel room and taxicab contexts for what these decisions say about reasonable expectations of privacy.

Recognizing the significant privacy interests that a guest has in a hotel room, the Supreme Court ruled more than forty years ago that hotel staff cannot provide valid consent for the police to search a hotel guest's room.  See Stoner v. California, 376 U.S. 483, 489-90 (1964) (holding that a hotel desk clerk's consent to a search of a guest's room was not valid because the Fourth Amendment rights of the hotel guest "would disappear if it were left to depend upon the unfettered discretion of an employee of the hotel"); United States v. Jeffers, 342 U.S. 48 (1951) (holding that assistant manager's consent to search of hotel room was invalid for Fourth Amendment purposes); Lustig v. United States, 338 U.S. 74 (1949) (holding that hotel manager's consent to police search of a room without a warrant in occupant's absence was unconstitutional).

---

[14]  To the extent that a passenger chooses to ride in a taxicab because its trunk provides space in which belongings or luggage may be secured, in Perea, as noted above, the Second Circuit held that that such a passenger does not possess a reasonable expectation of privacy in the cab's trunk.  Perea, 986 F.2d at 639.

In the context of taxicabs, however, the courts have reached a contrary result.  For example, in United States v. Woodrum, No. 98 Cr.10183 (RGS), 1998 U.S. Dist. LEXIS 18931, at *9 (D. Mass. 1998), aff'd, 202 F.3d 1, 10 (1st Cir. 2000), the court denied a motion to suppress filed by a passenger in a taxicab, based on the driver's consent to the police action.  In reaching this result, the court noted that "the operator of a taxi certainly has the authority to consent to its search over the objection of his passenger,"[15] but that "[t]he reverse, of course, is not true.  Given the passenger's fleeting association with the cab, he could not give effective consent to its search over the driver's objection."[16]  Id. at *9 & *9 n.2; see also United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008) (upholding denial of motion to suppress where cab driver had consented to search, and police recovered a gun under floor mat in the area where defendant-passenger had been sitting).

In sum, the hotel room analogy does not support Bulluck's argument that he had a reasonable expectation of privacy in the rear passenger area of the livery cab in which he was travelling.  Those travelling in automobiles have a lesser expectation of privacy than those in a dwelling place.  The fleeting nature of a taxicab ride is not comparable to a hotel stay, and lesser expectations of privacy flow from that fact.

---

[15]  In affirming, the First Circuit noted that the district court's assertion "overlooks that a mere passenger has a right to protest a traffic stop but no corresponding right to protest the search of someone else's vehicle."  Woodrum, 202 F.3d at 10 (citations omitted).  While acknowledging that passengers may object to a traffic stop, the First Circuit nonetheless concluded in Woodrum that the driver's consent was adequate to justify the stop.  Id. at 12-13.

[16]  As discussed below, drivers generally have "the authority to consent to a search of [a] vehicle. . . . [because] they have immediate possession of and control over [it]. . . .  Because a driver has control over the entire vehicle, that driver may consent to a full search of the vehicle, including its trunk, glove box and other components."  United States v. Morales, 861 F.2d 396, 399 (3rd Cir. 1988).

Moreover, hotel guests rent rooms precisely because they are seeking privacy, as the Supreme Court has recognized.  Olson, 495 U.S. at 98-99.  Those using a cab are seeking primarily transportation.  The level of control hotel guests and taxicab passengers have over the premises is also strikingly different.  Hotel guests have nearly complete control over access to their rooms, including possession of keys and control over locks, while a taxicab driver never surrenders the key to the car or control over its locks.  Finally, while there is decades-old law establishing that hotel staff cannot authorize the search of a guest's room, no such law exists with respect to taxicab drivers and their passengers.  Indeed, the applicable cases – which are few – go the other way.  For all of these reasons, this Court cannot find that a taxicab passenger's expectations of privacy are in any way comparable to those held by hotel guests.

> **b.      A Taxicab Passenger Does Not Have a Reasonable Expectation of Privacy in the Interior of a Cab**

Analysis of the ultimate question here must begin with the well settled law holding that non-owner passengers travelling in a vehicle generally do not enjoy a reasonable expectation of privacy in any part of that vehicle, Rakas, 439 U.S. at 130; Paulino, 850 F.2d at 97, and that, under Perea, 986 F.2d 633, taxicab passengers have no reasonable expectation of privacy in a taxicab's trunk.  The logic of all of these decisions is that the driver/owner has dominion and control over the vehicle and controls access to it, and that the passenger lacks a reasonable expectation of privacy because the passenger does not have the right to exclude others from the areas in question.  The issue here, then, is whether Bulluck – as a passenger in a livery cab – had sufficient dominion and control over the rear passenger area and the space under the driver's seat such that this Court should find that he had a reasonable expectation of privacy in these areas.

The cases that have found that taxicab passengers have such an expectation have noted that a passenger controls the destination of the cab and the route it takes.  In addition, Bulluck (Def. Post-Hearing Br. 15) points to the New York City Taxi and Limousine Commission's Livery Passenger's Bill of Rights, which states that a livery cab passenger has "the right to  . . . not share a ride, unless [the passenger] want[s] to."  New York City Taxi and Limousine Commission's Livery Passenger's Bill of Rights, available at: http://www.nyc.org/html/tlc/html/passenger/liveryrights.shtml (last visited April 29, 2010).  From this, Bulluck argues that he controlled access to the livery cab and had the right to exclude others from the passenger area of that cab.  (Def. Post-Hearing Br. 15-16)

There is no question that a taxi or livery cab passenger may exercise significant control over operation of the cab for the duration of his or her trip.  The fact that a passenger may dictate the destination and route of a cab ride and need not consent to share a cab with another paying fare, however, does not mean that the passenger has meaningful control over the interior of the vehicle.  A cab driver never surrenders dominion and control over the cab in a manner comparable to a hotel operator who gives a room key to a hotel guest.  Indeed, the cab driver never surrenders actual control over the cab to a passenger, maintains custody of the keys to the cab, and controls its locks at all times.  In that sense, the cab driver never relinquishes control over the interior of the cab to a passenger.

The fact that a passenger may object to the cab driver taking on another fare also does not equate with the capacity to exclude all others from the cab.  Cab drivers sometimes have non-paying colleagues, relief drivers, or family members in their cabs.

The presence of such individuals generally does not in any way delay or interfere with the paying customer's trip, and if it did, undoubtedly the customer would have standing to object to the Taxi and Limousine Commission.  The basis for that objection would not be that the presence of such an individual breached the sanctity of a private area occupied by the driver and the passenger, however, but rather that the presence of the non-paying passenger somehow delayed or interfered with the paying customer's trip.

Passengers have no meaningful privacy in a cab.  The driver – a perfect stranger – is inches away at all times and can see and hear everything that is happening in the rear seat.  Moreover, the windows of the cab generally permit anyone passing by to look inside the cab.

A taxicab passenger's presence in a cab is also highly transitory and generally fleeting, and ruling that such a passenger has an expectation of privacy in the interior of a cab could lead to absurd results.  For example, an individual traveling cross-country in an automobile for days or weeks with his or her friend and sharing the cost of gas would, under Rakas, have no expectation of privacy in that vehicle.  See, e.g., United States v. Jefferson, 925 F.2d 1242, 1251 (10th Cir. 1991) (holding that non-owner occupants of automobile used for extended road trip did not have reasonable expectation of privacy in the automobile because "[a]lthough the appellants point out that they took turns sleeping in the car during the return leg of their trip," the "Supreme Court [did not] intend[] that anytime an accused takes a long distance road trip in a car, the car is to be treated like a home for Fourth Amendment purposes.  The point remains that regardless of whether it is driven across town or across the country, a car does not envelop its occupants in a house-like cloak of Fourth Amendment protection.").   It is not reasonable

or consistent with societal norms to hold, given this well settled law, that a passenger

who will pay a $5.00 fare to a stranger for a five minute cab ride – in a vehicle he or she

will never see again – enjoys an expectation of privacy.

     Finding that such an expectation of privacy exists would also raise

difficult questions about what portions of the cab are in fact private.  It seems clear that a

taxicab passenger has no reasonable expectation of privacy with respect to the trunk,

Perea, 986 F.2d at 639, and the glove compartment of the vehicle, Rakas, 439 U.S. at

148-49, but to what extent does a passenger have an expectation of privacy as to the

interior of the cab?  Does that expectation extend merely to the seat the passenger

happens to be sitting in, to the passenger's seat and the area in front of or under that seat,

to the entire rear compartment, to the entire rear compartment and the area under the

entire front seat, to the front compartment as well?  Does the analysis change depending

on where the passenger is sitting?  In other words, does a passenger sitting next to the

driver have no expectation of privacy concerning the rear seat area?  Does the analysis

change depending on whether there is a partial or complete partition between the driver

and the passenger?  Finding that a taxicab passenger has a reasonable expectation of

privacy will lead to arbitrary determinations of what space in the cab is in fact private.

     Finding that such an expectation exists is also inconsistent with well

settled law – reflecting societal norms and common sense – holding that drivers generally

have "the authority to consent to a search of [a] vehicle. . . . [because] they have

immediate possession of and control over [it]. . . . Because a driver has control over the

entire vehicle, that driver may consent to a full search of the vehicle, including its trunk,

glove box and other components."  United States v. Morales, 861 F.2d 396, 399 (3rd Cir.

1988); see also United States v. Sparks, 287 Fed. App'x 918, 920-21 (2d Cir. 2008) (unpublished opinion) (driver's consent to search of vehicle and its contents created valid consent to search bag located in the back seat despite the fact the bag belonged to a passenger and not to the driver); United States v. Eldridge, 984 F.2d 943, 948 (8th Cir. 1993) ("The driver of a car has the authority to consent to a search of that vehicle.  As the driver, he is the person having immediate possession of and control over the vehicle."); United States v. Brickley, 1990 U.S. App. LEXIS 18583, at *3 n.2 (6th Cir. Oct. 19, 1990) (unpublished opinion) (per curiam) (driver's consent justified police search of car even though car's owner was also present in the vehicle (citing United States v. Matlock, 415 U.S. 164, 171 & n.7 (1974)); United States v. Varona-Algos, 819 F.2d 81, 83 (5th Cir. 1987) (driver's consent to search vehicle valid against passenger who later claimed to be vehicle's owner); United States v. Nunez-Daza, No. 99 Cr. 291 (LMM), 2000 U.S. Dist. LEXIS 11121, at *11-12 (S.D.N.Y. Aug. 3, 2000) (holding that driver's consent to search was valid because the driver has "'immediate possession of and control over the vehicle,'" "'general access to all areas of the vehicle,'" and therefore "'has the requisite joint access and control giving rise to the authority to consent to a full search of a vehicle.'" (quoting Morales, 861 F.2d at 399 (citations and footnote omitted))); United States v. Mazzella, 295 F. Supp. 1033, 1036 (S.D.N.Y. 1969) ("The driver, as bailee in possession, had authority to consent to the search.")

    A ruling that taxicab passengers and cab drivers share an expectation of privacy in some undefined portion of the interior of a cab – undefined because it depends on where the passenger happens to be sitting – will be difficult for police to apply.  While joint ownership or tenancy concepts are frequently applied in the Fourth Amendment

context, see, e.g., United States v. McGee, 564 F.3d 136, 139 (2d Cir. 2009) (in

"common authority" case, "[a]uthority to consent to a search rests on 'mutual use of the

property by persons generally having joint access or control for most purposes, so that it

is reasonable to recognize that any of the co-inhabitants has the right to permit the

inspection in his own right and that the others have assumed the risk that one of their

number might permit the common area to be searched'" (quoting United States v.

Matlock, 415 U.S. 164, 171 n.7 (1974)), they generally arise in connection with rights

and relationships that have some stability and significant duration, not – as here – in what

is typically a brief and fleeting encounter.

        For all these reasons, this Court holds that Bulluck, like a passenger in a

private automobile, did not possess a reasonable expectation of privacy in the rear seat

area of the livery cab in which he was travelling.  Accordingly, he has no cognizable

Fourth Amendment interest in that area.[17]

---

[17]  Although the Court specifically invited Bulluck to brief the question of whether he had an independent expectation of privacy in the plastic bags seized by the police (1/7/10 Tr. 94) – requiring that the opening of the plastic bags be justified by an exception to the Fourth Amendment's warrant requirement – the Defendant did not brief this issue.  It is the Defendant's burden to establish that he had a reasonable expectation of privacy in a particular area or object searched.  See United States v. Sparks, 287 Fed. App'x 918, 919-920 (2d Cir. 2008) (unpublished opinion) ("A defendant seeking to suppress evidence seized during a warrantless search bears the burden of showing that he had a reasonable expectation of privacy in the place or object searched. . . ." (citing California v. Greenwood, 486 U.S. 35, 39 (1988); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); Perea, 986 F.2d at 639 (2d Cir. 1993))).  Because Bulluck has not briefed this issue, it will not be addressed by this Court.

## **CONCLUSION**

The Defendant's motion to suppress is DENIED.

Dated: New York, New York
May 13, 2010

SO ORDERED.

Paul G. Gardephe
United States District Judge